

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: April 16, 2019.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| OLMOS EQUIPMENT, INC., | § | CASE No. 16-51834-CAG |
| | § | |
| | § | Chapter 7 |
| Debtor. | § | |

| | | |
|---|---|---|
| RONALD HORNBERGER, | § | |
| LITIGATION TRUSTEE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 18-05238-CAG |
| | § | |
| DAVIS CEDILLO & MENDOZA, INC., | § | |
| | § | |
| Defendant. | § | |

### ORDER GRANTING IN PART, DENYING IN PART, DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR FAILURE TO STATE CAUSE(S) OF ACTION PURSUANT TO RULE 12(B)(6) (ECF NO. 12)

On December 31, 2018, Defendant Davis Cedillo & Mendoza, Inc. ("Defendant" or

"DCM") filed its Motion to Dismiss First Amended Complaint For Failure to State Cause(s) of Action Pursuant to Rule 12(b)(6)(ECF No. 12)(the "Motion").[1] On January 21, 2019, Plaintiff filed his Opposition to Motion to Dismiss First Amended Complaint For Failure to State Cause(s) of Action Pursuant to Rule 12(b)(6)(ECF No. 13). On January 27, 2019, Defendant filed its Reply to Opposition to Motion to Dismiss First Amended Complaint For Failure to State Cause(s) of Action Pursuant to Rule 12(b)(6) (ECF No. 14). The Court did not set the matter for hearing and took the matter under advisement. After considering the arguments made and the pleading of counsel, and the file and record in the case, the Court finds that the Defendant's Motion to Dismiss should be granted as to Count 1 of the First Amended Complaint (Preferential Transfers) and denied as to Counts 2 (Fraudulent Transfers) and Count 3 (Objection to Claim No. 35).

## JURISDICTION

This Court has jurisdiction over this Motion to Dismiss pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A) (administration of the estate), (B) (allowance or disallowance of claims), (F) (proceedings to determine, avoid, or recover preferences), and (H) (proceedings to determine, avoid, or recover fraudulent conveyances). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for relief is Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding through Fed. R. Bankr. P. 7012 and Local Rule 7012.

## BACKGROUND

On August 12, 2016, Olmos Equipment Inc. ("OEI" or "Debtor") filed its chapter 11 petition for relief. (ECF No. 1) (Bankruptcy No. 16-51834-cag). Debtor filed its First Amended Disclosure Statement on January 12, 2017. (ECF No. 181) (Bankruptcy No. 16-51834-cag).

---

[1] "ECF" refers to the Electronic Court File and "No." refers to the electronic entry on the docket sheet for this adversary proceeding.

Debtor filed its First Amended Chapter 11 Plan on April 21, 2017. (ECF No. 255)(Bankruptcy No. 16-51834-cag). On May 1, 2017, the Order Confirming Chapter 11 Plan was entered on the Court's docket. (ECF No.258)( Bankruptcy No. 16-51834-cag).

The First Amended Plan provides:

5.06. The Litigation Trust:

> (a) Establishment of the Litigation Trust. On the Effective Date, the Litigation Trust shall be established pursuant to the Trust Agreement [(attached as Exhibit "A" to the First Amended Plan)] for the purposes of administering the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries which are or may be Allowed, as provided in the Plan. On the Effective Date, the Trust Agreement shall be executed and all other necessary steps shall be taken to establish the Litigation Trust and the beneficial interests therein.

Section 1.2(b) of the Trust Agreement describes "Litigation Trust Assets" as Causes of Action as that term is defined in Section 1.12 of the Plan.

Section 1.12 of the First Amended Plan defines "Causes of Action" as:

> Causes of Action: means (i) Avoidance Actions; (ii) any and all liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, in law, equity, or otherwise, including, but not limited to claims arising from any act or omission, including, but not limited to alter ego, piercing of the corporate veil, misconduct, misfeasance, malfeasance, breach of fiduciary duty, breach of duty of loyalty, breach of duty of care, negligence, gross negligence, fraud or any other intentional tort, and any civil conspiracy or civil RICO claims for such misconduct, and (iii) derivative claims and causes of action, including but not limited to veil piercing, alter ego and other similar causes of action. Causes of Action do not include any Claims owned by a non-Debtor individual or entity relating to a direct and particularized harm or injury which that individual/entity has exclusive standing to pursue. Furthermore, Causes of Action do not include the Debtor's accounts, commercial tort claims, rights of setoff or recoupment, claims, rights and/or damages: (a) relating to sums due and owing to it by its customers, contractors, suppliers, subcontractors and/or third parties (b) relating to Debtor's completed jobs or work in progress and (c) in which Class 1, 2, 3, 4 or 5 Creditors have a security interest or lien.

Under the First Amended Plan, Ronald Hornberger was appointed as Litigation Trustee for OEI.

In that capacity, the Litigation Trustee filed his Original Complaint on July 26, 2018. (ECF No. 1). Defendant filed its Motion to Dismiss for Failure to State Cause(s) of Action Pursuant to Rule

3

12(b)(6) and for Lack of Subject Matter Jurisdiction Over Certain Claims Pursuant to Rule 12(b)(1). (ECF No. 4). Plaintiff filed an Objection to the Motion to Dismiss on October 18, 2018. (ECF No. 5). Defendant filed a Reply in Support of its Motion to Dismiss on October 25, 2018. (ECF No. 6). The Court convened a hearing on the Motion to Dismiss on November 27, 2018.

The Original Complaint alleged three causes of action: (1) payments to DCM were a preference under 11 U.S.C. § 547[2]; (2) payments to DCM were a fraudulent transfer under §§ 544, 548, and 550; and (3) an objection to DCM's proof of claim under § 502. The Court entertained oral argument on the Motion to Dismiss and responsive pleadings. After oral argument, the Court granted the Motion to Dismiss as to the preference action under Count 1, noting that the allegations in the Original Complaint were insufficient under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) to establish that the transaction between OEI and DCM was not arm's length. The Court denied the Motion to Dismiss as to Counts 2 and 3. Plaintiff was granted leave to amend the Complaint and did so on December 17, 2018, filing Plaintiff's First Amended Complaint. (ECF No. 11).

As noted herein, Plaintiff timely filed his First Amended Complaint on December 17, 2018. (ECF No. 11). Plaintiff alleges three claims for relief: (1) recovery as a preferential transfer under § 547; (2) fraudulent transfer under §§ 544, 547 and 548; and (3) objection to proof of claim under § 502. Defendant argues on various grounds that the claims for relief do not meet the plausibility standard under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[2] Unless otherwise noted, all references are to Title 11, 11 U.S.C. § *et seq.*

4

# DISCUSSION

## I. Legal Standard

In the Fifth Circuit, when considering a motion to dismiss for failure to state a claim, the court must "accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff." *Thompson v. City of Waco, Texas*, 764 F.3d 500, 502–03 (5th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "To survive dismissal, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; see also *Twombly*, 550 U.S. at 570 (holding complaint must allege enough facts to move the claim "across the line from conceivable to plausible"). The determination of whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc) ("Our task, then, is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success."). Motions to dismiss under Fed. R. Civ. P. 12(b)(6) are "viewed with disfavor and [are] rarely granted." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (citing *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)).

"On a motion to dismiss, the court may properly consider the documents attached to or incorporated by reference in the plaintiff's complaint, facts of which judicial notice may be taken, and matters of public record." *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.,* 336 F.3d 375, 379 (5th Cir.2003) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th

5

Cir.1996)). "A court may take judicial notice of related proceedings and records in cases before the same court." *MacMillan Bloedel Ltd. v. Flintkote Co.*, 760 F.2d 580, 587 (5th Cir. 1985).

## II. Legal Analysis

The Litigation Trustee alleges that, though not an original shareholder, Larry Struthoff ("Struthoff") became a shareholder of OEI in 2010. (ECF No. 11 at ¶ 4.06). From at least 2011 through August 12, 2016 (the "Petition Date"), Struthoff was the majority shareholder and served as a Director and President of OEI. (*Id*.). Tracey Janicke ("Janicke") was a shareholder of OEI and served as a Director and an Officer of OEI. (*Id*.). Debtor's Statement of Financial Affairs states that Struthoff and Janicke owned 63.5% of the issued and outstanding equity interests in OEI. (*Id*.). Plaintiff alleges that Struthoff controlled OEI at all times relevant to the claims made by the Litigation Trustee against DCM. (*Id*.).

The Litigation Trustee alleges that Struthoff was a shareholder, director, and officer of S.W.L. Enterprise, Inc. ("SWL"). (*Id*. at ¶ 4.07). SWL, during it existence, was also owned by Hugh Long ("Long") and Jim Weynand (Weynand"). Struthoff also controlled Olmos Construction, Inc and was the manager of Olmos Companies I, LLC, the company that paid the original retainer of $200,000 to DCM. (*Id*.). On or about May 19, 2011, Weynand filed suit against OEI and its affiliates, Struthoff, Hugh Long, SWL and Janicke in Bexar County under Cause No. 201CI08332 styled *Jim Weynand v. Olmos Equipment Inc., et al* (the "Weynand Litigation"). (*Id*. at ¶ 4.09). The Weynand Litigation principally concerned the dispute between Weynand, Long, and Struthoff over the sale by Weynand, Long and Struthoff of Olmos Construction, Inc. and SWL to OEI. (*Id*.). Weynand contended that Struthoff, Long, and Janicke through their management and control of OEI, breached their fiduciary obligations to Weynand and shorted Weynand approximately $6,000,000.00 in connection with the transaction through the

manipulation of the books of OEI. (*Id*.) Struthoff directed OEI to pay the legal fees of Struthoff, SWL, and Janicke as well as OLE's legal fees. (*Id*. at ¶ 4.10).

According to the Litigation Trustee, Struthoff took total control of OEI effective November 14, 2011, when all existing shareholders of OEI irrevocably granted their proxy to Struthoff through January 24, 2015 and granted Struthoff control of the management and operations of OEI. (*Id*. at ¶ 4.11). The transfer of control to Struthoff was memorialized by the Written Consent for Special Meetings, Resolutions and Affidavit of the Board of Directors & Shareholders of Olmos Equipment, Inc. to Extend Voting Rights until the 24th day of January, 2015 (the "Control Resolution"):

> Whereas, the Corporation have [sic] still been adversely effected by external factors, including the poor economy, labor and materials markets, and decline in the construction market, as well as by internal factors including, internal lawsuits, and external lawsuits. As a consequence the Corporation is unable to meet its financial, legal and contractual obligations, including its ability to pay its accounts payable and payroll and it cannot purchase needed materials necessary for current contractual obligations with its customers. The Corporation is essentially broke and bankrupt.

(*Id*.; Exh. 1)

The Litigation Trustee also alleges that DCM began working on and billing for the representation of Struthoff, SWL, and OEI immediately, but DCM did not formally accept the engagement until August 14, 2015, some 75 days later, when DCM entered into a Legal Representation Agreement with OEI, SWL and Struthoff in connection with the Weynand Litigation (the "DCM Engagement Letter"). (*Id*. at ¶ 5.15; Exh 2). Pursuant to the DCM Engagement Letter, DCM assumed representation of OEI, Struthoff, and the then defunct entity, SWL. The agreement further required that all fees were to be paid "in full no later than thirty days from the date on which the fee statement is received by Clients. . . ." (*Id*.). The DCM Engagement Letter also acknowledged the receipt of a retainer in the amount of $200,000.00 paid by Olmos

7

Companies 1 LLC, a company wholly owned and controlled by Struthoff, which funds would be used to satisfy the firm's billings through July 2, 2015. (*Id*.). Plaintiff alleges that, at least as of the date of the execution of the DCM Engagement Letter, DCM knew of the limitations under the governing corporate documents on the ability of OEI to pay for the representation of Struthoff and the prohibition against the payment for the representation of SWL. (*Id*.).

Plaintiff alleges that, by DCM's access to the books and records of OEI both before and after the formalization of the engagement of DCM by Struthoff and OEI, DCM was in actual possession of knowledge otherwise only available to those closely involved with the inner-workings of OEI. (*Id*. at ¶ 4.17). In addition to access to information otherwise only available to "insiders" of OEI, DCM knew or should have known at the time that DCM contracted with OEI, Struhtoff, and SWL that the transaction evidenced by the DCM Engagement Letter was not an ordinary course, arms-length transaction and, in fact, was prohibited under the bylaws of OEI. (***Id***.). Plaintiff alleges that DCM, in its election to disregard the governing documents of OEI and the public records on file with the State of Texas, and contract with Struthoff for the representation of the interests of Struthoff and SWL, knowingly and intentionally entered into a transaction that was, from its inception, not arms-length. (*Id*.).

Moreover, Plaintiff alleges that the dealings between DCM and OEI further evidence a less-than-arms-length transaction through the conscious disregard by DCM of the contractual terms of the DCM Engagement Letter, including the acceptance of payments outside of the payment terms proscribed by the DCM Engagement Letter. (*Id*. at ¶ 4.18).

"Following an approximately three month trial, the jury returned a verdict on December 17, 2015, finding that: (1) OEI breached its agreement with Weynand and committed statutory fraud against him, resulting in damages of $3,400,000.00 and $68,815.922, respectively; (2)

Struthoff breached his fiduciary duty to Weynand and breached his fiduciary duty to SWL, resulting in damages of $233,333.33; and (3) Janicke committed statutory fraud against Weynand, resulting in damages of $68,815.923." (*Id*. at ¶ 4.20).

Plaintiff alleges that, at the time that DCM assumed representation of Struthoff, SWL and OEI, DCM knew that the financial livelihood of OEI was inextricably tied the success of the defense of Struthoff directly and through SWL and OEI in the Weynand Litigation. (*Id*. at ¶ 4.21). Because of the relationship of DCM to OEI, directly and through Struthoff, DCM had actual knowledge that the acceptance of payments for the legal representation of Struthoff (directly and on behalf of SWL and OEI) was not authorized by the Bylaws of OEI and, if the representation proved unsuccessful, the payment by OEI to DCM violated the Bylaws. (*Id*.) Plaintiff alleges that, at the time of the engagement, DCM was (or should have been) aware of the of insolvency of OEI. (*Id*.).

Plaintiff contends that the Bylaws of OEI only authorize the payment and/or reimbursement of legal fees under limited circumstances: to Struthoff, and only if the representation is "successful." (*Id*. at ¶ 4.22). Though the Control Resolution contemplates the payment of the fees and expenses of Struthoff and Janicke to Chunn, based upon the books and records of OEI made available to the Litigation Trustee, the Bylaws of OEI were never modified to permit payment or reimbursement in the absence of success; a fact which DCM should have been aware at the time of the execution of the DCM Engagement.  (*Id*.). Plaintiff alleges that the records of OEI are devoid of any authorization for the hiring of DCM, whether directly or on behalf of Struthoff and/or SWL, or the payment to DCM of the fees incurred in connection with that representation. (*Id*.).

Plaintiff alleges that Struhoff, as the majority shareholder and sole control person of OEI

and the only remaining shareholder of SWL with successor liability for the alleged breaches of fiduciary duty to Weynand, representation by DCM under the DCM Engagement Letter was substantially for Struthoff's (and SWL's) benefit, and not OEI. (*Id*. at ¶ 4.23). Plaintiff maintains that, even if OEI were authorized to have paid the fees incurred by DCM in connection with the representation of Struthoff (and those controlled by him), which the Litigation Trustee disputes, the Bylaws precluded such payment because the representation was not successful. (*Id*.).

Based upon the billing statements, DEM continued to represent Struthoff, SWL, and OEI, through March 24, 2016. Plaintiff believes that between April 25, 2016 and April 25, 2018, DCM billed an additional $53,290.98. (*Id*. at ¶ 4.28). Between July 25, 2015 and March 25, 2016, DCM billed OEI a total of $1,890,656.61 and an additional $53,290.98 for the period April 25, 2016 through April 25, 2018. (*Id*.). The payments received by DCM were as follows:

1. 8/14/2015: $200,000.00 from Olmos Companies 1LLC;
2. 9/10/2015: $100,000.00 from OEI;
3. 10/22/2015: $100,000.00 from OEI;
4. 11/16/2015: $100,000.00 from OEI;
5. 11/20/2015: $100,000.00 from OEI; and
6. 6/30/2016: $25,000.00 from Struthoff.

(Payments identified at 2 through 5 are collectively referred to as the "OEI Payments"). Plaintiff alleges that the OEI Payments were not made in accordance with the terms of the DCM Engagement Letter. (*Id*. at ¶ 4.28). Plaintiff alleges that based upon a simple liquidation analysis of assets minus liabilities, the receipt by DCM of the OEI Payments in the one-year period preceding the filing of the bankruptcy resulted in DCM receiving more that DCM would have received in a chapter 7 liquidation. (*Id*.).

DCM argues that DCM is neither a statutory nor non-statutory insider. Further, DCM maintains that Plaintiff has not shown that the transaction between DCM and Debtor was not arm's length.

Count 1 seeks to avoid the OEI Payments as preferential transfers pursuant to § 547 and to recover such funds pursuant to § 550. Section 547(b) states that:

> **(b)** Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
>> **(1)** to or for the benefit of a creditor;
>> **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> **(3)** made while the debtor was insolvent;
>> **(4)** made--
>>> **(A)** on or within 90 days before the date of the filing of the petition; or
>>> **(B)** between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> **(5)** that enables such creditor to receive more than such creditor would receive if--
>>> **(A)** the case were a case under chapter 7 of this title;
>>> **(B)** the transfer had not been made; and
>>> **(C)** such creditor received payment of such debt to the extent provided by the provisions of this title.

Section 101(31) defines insider as it relates to a corporation as:

> **(31)** The term "insider" includes--
>> **(A)** if the debtor is an individual--
>>> **(i)** relative of the debtor or of a general partner of the debtor;
>>> **(ii)** partnership in which the debtor is a general partner;
>>> **(iii)** general partner of the debtor; or
>>> **(iv)** corporation of which the debtor is a director, officer, or person in control;
>> **(B)** if the debtor is a corporation--
>>> **(i)** director of the debtor;
>>> **(ii)** officer of the debtor;
>>> **(iii)** person in control of the debtor;
>>> **(iv)** partnership in which the debtor is a general partner;
>>> **(v)** general partner of the debtor; or
>>> **(vi)** relative of a general partner, director, officer, or person in control of the debtor.

Under § 547(b), Plaintiff is attempting to recover payments from DCM that it received over the period of 90 days to one year prior to OEI filing bankruptcy. Therefore, to prevail on a preference for this period, DCM must be classified as an insider. The Court agrees with Defendant

11

that there are no facts in the First Amended Complaint that support any allegation that DCM exerted control over the ongoing business operations of OEI under such that DCM could be defined as an insider under § 101(31). DCM provided legal services, billed, and was partially paid for those services during OEI's business. As such, the Court finds that DCM is not a statutory insider. Therefore, the Court must determine if DCM is a non-statutory insider of OEI. The Fifth Circuit's opinion in ***Browning Interests v. Allison (In re Holloway)***, found that non-statutory status is reached when a transferee has a sufficiently close relationship with a debtor, which may be based on control or influence over the debtor, such that any dealings between the transferee and the debtor are not at arm's length. 955 F.2d 1008, 1011 (5th Cir. 1992) (first citing ***In re Friedman***, 126 B.R. 63, 70 (9th Cir. B.A.P. 1991); then citing ***In re Schuman***, 81 B.R. 583, 586 (9th Cir. B.A.P. 1987); and then citing ***In re Lemanski***, 56 B.R. 981, 983 (Bankr. W.D. Wis. 1986) (a transferee "is an insider if, as a matter of fact, he exercises such control or influence over the debtor as to render their transaction not arm's length")).

The Court determined at the hearing on DCM's Motion to Dismiss Plaintiff's Original Complaint that the Litigation Trustee failed to demonstrate that it was plausible that DCM is a non-statutory insider under § 547 because the Litigation Trustee failed to allege that the transactions between DCM and Debtor were not arm's length. The Court granted Plaintiff the opportunity to amend Count 1 to assert enough facts to support the necessary element of his claim, being, that the Debtor OEI and DCM were not operating at arm's length at the time of the challenged transactions. The Court notes that there is no controlling definition of non-statutory insider in the Fifth Circuit because ***Holloway***, while instructive, was not a § 547 preference action, but a claim for relief under Tex. Bus. Comm. Code Ann. § 24.006(b). ***Holloway***, 955 F.2d 1010. The Supreme Court recently had a case involving the definition of a non-statutory insider in ***U.S.***

*Bank Nat'l Assoc. v. Village at Lakeridge, LLC*, 138 S. Ct. 960 (2018), but only granted certiorari as to the standard for review of a lower court's determination of non-statutory insider status. That said, there are appellate decisions that have considered how to define non-statutory status and the factors applicable to that analysis.

In *Anstine v. Carl Zeiss Meditec (In re U.S. Medical, Inc.)*, 513 F.3d 1272, 1277–78 (10th Cir. 2008), the Tenth Circuit noted that:

> The legislative history for the definition of "insider" states that "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor." S.Rep. No. 95-989, at 25 (1978), 1978 U.S.Code Cong. & Admin.News 5787, 5810; H.R.Rep. No. 95-595, at 312 (1977); *see* Aplee. Br. at 14, 25. "In ascertaining insider status, then, courts have looked to the closeness of the relationship between the parties and to whether any transactions between them were conducted at arm's length." *In re Krehl,* 86 F.3d 737, 742 (7th Cir.1996). A leading treatise supports this view. 5 Allen N. Resnick & Henry J. Sommer, *Collier on Bankruptcy,* ¶ 547.03[6] (15th rev. ed. 2008) ("The consideration of insider status focuses on two factors: (1) the closeness of the relationship between the parties; and (2) whether the transaction was negotiated at arm's length."). Courts have also assessed the presence or absence of control of the debtor by the creditor and whether the creditor has access to inside information. *See Kunz,* 489 F.3d at 1079; *Krehl,* 86 F.3d at 743. The inquiry then is whether there is a close relationship *and* whether there is anything other than closeness to suggest that any transactions were not conducted at arm's length. *See Krehl,* 86 F.3d at 742.

(internal footnotes omitted). The Tenth Circuit ruled that to be a non-statutory insider that the relationship between the debtor and creditor be not only close, but that is also at less than arm's length. *Id*. at 1278. Notably, the Tenth Circuit also held that, as to the issue of "actual control," if a party could prove that a creditor dictates corporate policy and the disposition of corporate assets, then such a level of control would make the creditor a statutory insider, and not a non-statutory insider. *Id*. at 1279.[3] DCM argues that at most DCM and OEI had a contractual relationship at the

---

[3] *See also* ***In re Winstar Comm., Inc.***, 554 F.3d 382, (3d Cir. 2013) ( "We agree with Lucent that actual control (or its close equivalent) is necessary for a person or entity to constitute an insider under § 101(31)'s "person in control" language. However, a finding of such control is not necessary for an entity to be a non-statutory insider."). *See also*

time the engagement letter was signed. Further, there are no allegations of a pre-existing relationship between DCM and Debtor other than Plaintiff's assertion that DCM conducted a due diligence examination of OEI roughly 75 days before agreeing to represent Debtor. As such, accepting Plaintiff's allegations as true, the Court cannot discern how the attorney–client relationship and agreement between OEI and DCM is any different than any attorney–client relationship. The fact that Debtor was in financial distress at the time of engagement and subsequent payments is not different than any other situation where a party is threatened with suit with a potential loss resulting in bankruptcy.

As noted herein, there is a dearth of case law construing non-statutory insider status within the Fifth Circuit and other federal courts. Not surprisingly, the Parties did not provide, nor did this Court identify, cases dealing with a law firm representing multiple parties, including a chapter 7 debtor, where a preference is alleged as to counsel's fees. There are appellate opinions dealing with non-statutory insiders and none are factually similar to the case at bar. That said, the courts' analysis is consistent. In *U.S. Medical, Inc.*, the insider status at issue involved the CEO of debtor's creditor being appointed to debtor's board in accordance with a stock-purchase agreement. 531 F.3d at 1274. During the relevant preference period, creditor received sporadic payments and inventory returns from debtor. *Id*. The bankruptcy court focused on the closeness between creditor and debtor, but the Tenth Circuit noted that despite that finding, there was no evidence that creditor's representative controlled or exercised any undue influence on the debtor. *Id*. The trustee in *U.S. Medical, Inc.* argued that because creditor was on debtor's board, and had access to information only known to debtor's board, that that knowledge enabled creditor to take advantage

---

*In re U.S. Med.*, 531 F.3d at 1279 ("A finding of actual control by the bankruptcy court would make Creditor a statutory insider and would avoid the question of whether it was a non-statutory insider altogether").(internal footnote omitted).

14

of debtor's financial situation. *Id*. at 1281. The Tenth Circuit found that access to inside information alone was insufficient alone to support a finding of non-statutory insider status without a showing of how the creditor used and benefitted from that knowledge. *Id*.

In ***Stalnaker v. Gratton (In re Rosen Auto Leasing)***, 346 B.R. 798, 801 (8th Cir. B.A.P. 2006), the debtor's chairman, Rosen, and Gratton were social friends first and then Gratton began loaning Rosen money for his auto business. Gratton also purchased shares in debtor's business and loaned debtor $300,000 with a promissory note serving as the basis for repayment. *Id*. Gratton did not serve on debtor's board, nor did he have voting rights, and had limited knowledge of the debtor's financial situation. *Id*. Debtor was unable to make payments under the promissory note and Gratton and the Rosen entered into a series of unsecured transactions in which Gratton continued to loan Rosen money. *Id*. at 802. Rosen did grant Gratton a security interest in his condominium as security for repayment. *Id*. The corporate debtor and chairman of the debtor each filed bankruptcy and the two cases were consolidated. *Id*. at 803. The trustee argued that the granting of the security interest in the condominium was a preference under § 547 because Gratton was an insider of debtor and because Gratton had required debtor to repay its obligation to Gratton. *Id*. at 804. The court found that:

> In the instant case, the [bankruptcy] court determined that Mr. Gratton was not an insider of either Mr. Rosen or Rosen Auto. Mr. Gratton had a prior social relationship with Mr. Rosen which had soured years before the transactions in dispute occurred. He had a debtor-creditor relationship with Rosen Auto and with Mr. Rosen as a result of the personal guarantee. Mr. Gratton demanded payment and received the Check from Rosen Auto. At Mr. Rosen's suggestion, Mr. Gratton endorsed the Check to Mr. Rosen in exchange for the Personal Note and the lien on the condominium. Mr. Gratton never exerted control over Rosen Auto or Mr. Rosen, nor did he have any relationship with either other than a debtor-creditor relationship at all relevant times. The bankruptcy court correctly determined that Mr. Gratton was not an insider of either debtor.

*Id*.

In *Holloway*, the Fifth Circuit considered whether a creditor and also former wife of a debtor could be considered an insider under Tex. Bus. Comm. Code Ann. § 24.006(b). *Holloway* at 1010. For guidance on the issue, the Fifth Circuit also examined the definition of insider under § 101(31) of the Bankruptcy Code and the related case law:

> The cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. *E.g., In re Friedman*, 126 B.R. 63, 70 (9th Cir.B.A.P.1991) ("insider status may be based on a professional or business relationship with the debtor, in addition to the Code's per se classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain advantage attributable simply to affinity rather than to the course of business dealings between the parties"); *In re Schuman*, 81 B.R. 583, 586 (9th Cir.B.A.P.1987) ("The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor."); *In re Benson*, 57 B.R. 226, 229 (Bankr.N.D.Ohio 1986) (an insider may be anyone "whose close relationship with the debtor subjects transactions made between the two parties to careful scrutiny"); *In re Lemanski*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986) (a transferee "is an insider if, as a matter of fact, he exercises such control or influence over the debtor as to render their transaction not arms-length"); *In re Montanino*, 15 B.R. 307, 310 (Bankr.D.N.J.1981) (an insider "is one who has such a relationship with the debtor that their dealing with one another cannot be characterized as an arm's-length transaction").

*Id*. at 1011. As to the first prong, the Court found that the closeness of the relationship between creditor and debtor maintained a close relationship because they used to be married to each other, they stayed in frequent contact with each other, they sought to protect each other from the litigation ensuing in debtor's bankruptcy, and creditor testified she made the loan to the debtor due to the impact debtor's hardships were having on their children. *Id.* ay 1011–12. In examining whether the subject transactions were conducted at arm's length, the Fifth Circuit identified a number of facts as relative to such determination. First, the loans were initially unsecured by any collateral, despite knowing that the debtor was insolvent. *Id.* at 1012. Moreover, despite such knowledge,

16

when she received and recorded the corresponding security agreement, she did not perfect such security interest or assert a claim until after debtor filed bankruptcy and another claimed moved to lift the automatic stay. *Id.* Next, the Fifth Circuit found that the loans from creditor to debtor were not commercially motivated; rather, the loans were made to mitigate damage caused to her children by her husband's involvement in litigation. *Id.* The Fifth Circuit also noted that no prudent lender would have made such loans under such circumstances. *Id.* Finally, the Fifth Circuit found that debtor, who otherwise had no reason or standing to become involved in the dispute regarding creditor's claim, did not remain disinterested and affirmatively sided with creditor. *Id.* [4]

In *In re Village at Lakeridge, LLC*, 814 F.3d 993, 997 (9th Cir. 2016), *aff'd*, 138 S. Ct. 960 (2018), the Ninth Circuit found that debtor, Village at Lakeridge, LLC ("Lakeridge"), had only one member: MBP Equity Partners 1, LLC ("MBP") who was managed by a board of five members, one of whom is Kathie Bartlett. *Id*. Bartlett shared a close business and personal relationship with Rabkin, which was unrelated to Bartlett's position with MBP. *Id*. MBP's board decided to sell MBP's unsecured claim. *Id*. Bartlett approached Rabkin with an offer to sell the claim. *Id*. Rabkin purchased the claim for $5,000. *Id*. In its Disclosure Statement, Lakeridge classified Rabkin's claim as a "Class 3 general unsecured claim", which then became a non-insider claim for purposes of voting in favor of the plan under § 1129(a)(10). [5] Without Rabkin's affirmative vote, Lakeridge could not confirm the plan because it had no other impaired accepting non-insider votes. *Id*. A creditor to the plan, U.S. Bank, objected to the plan and moved to have

---

[4] In examining whether the transaction at issue was conducted at arm's length, the Fifth Circuit concluded that evidence of direct control over the debtor's financial affairs was not necessary and that an inference that a creditor is in a position to exert influence over the debtor is sufficient to find that the a transaction was not conducted at arm's length. *Holloway*, 955 F.2d at 1013.

[5] If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

Rabkin's vote not counted, arguing that his claim was both a non-statutory and statutory insider and could not be counted for purposes of plan confirmation.[6] The Ninth Circuit disagreed. In doing so, the court adopted prior holdings of other courts in finding that:

> Non-statutory insiders are the functional equivalent of statutory insiders and, therefore, must fall within the ambit of § 101(31). *See In re Winstar Commc'ns, Inc.,* 554 F.3d at 395. A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's length. *See Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.),* 531 F.3d 1272, 1277 (10th Cir.2008). A court cannot assign non-statutory insider status to a creditor simply because it finds the creditor and debtor share a close relationship. *See id.* at 1277–78.

*Id.* at 1001 (internal footnote omitted). The Ninth Circuit found that Rabkin did not fall within the ambit of a non-statutory insider:

> Rather, the evidence shows Rabkin had little knowledge of Lakeridge—or its sole member MBP—prior to acquiring MBP's unsecured claim, much less access to inside information. Rabkin does not control MBP or Lakeridge, nor does Lakeridge or MBP have any control over Rabkin. U.S. Bank has shown that Rabkin had a close personal and business relationship with Bartlett, and that Bartlett approached Rabkin, and only Rabkin, with an offer to sell MBP's claim. However, Bartlett does not control MBP or Lakeridge. Rather, Bartlett was one of MBP's five managing members, all of whom discussed potential buyers and agreed to offer the claim to Rabkin. Rabkin did not know, and had no relationship with, the remaining four managing members of MBP.

*Id.* at 1002.

The Supreme Court granted certiorari to determine whether de novo or for clear error standard of review applies to a lower court's determination of insider status. ***U.S. Bank Nat'l Assoc. v. The Village at Lakeridge, LLC***, 138 S. Ct. 960, 963 (2018). The Court held that, in the instance of the Ninth Circuit's test, a clear-error standard should apply. *Id.* The Court did not rule

---

[6] Section 1126(e) states that "On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."

on what constitutes a non-insider for purposes of the Code other than to acknowledge what other courts have held to be the proper definition.[7]

DCM argues that the Trustee's First Amended Complaint only alleges that a contractual relationship existed between DCM and Debtor, along with SWL and Larry Struthoff, an officer, director and shareholder of the Debtor, as parties to the "Legal Representation Agreement" dated August 14, 2015. ( ECF No. 12 at 5). DCM argues that an attorney–client relationship was entered in the ordinary course of business of the parties for DCM to provide legal services to the Debtor, and the others, on the eve of a pending trial by DCM in exchange for payment for those services by Debtor, SWL, and Larry Struthoff. (*Id*.). DCM maintains that it was engaged to perform particularized legal tasks and for specific purposes, namely, to defend at a trial in a few weeks coming, each of OEI, Struthoff and SWL from the $8,000,000.00 - plus claims of Plaintiff Weynand. (*Id*. at 6).

DCM notes that the First Amended Complaint refers to the OEI Bylaws, which are attached to the Complaint as Exhibit 3, and Trustee's conclusion that a supposed violation of the Bylaws occurred, but the Trustee fails to support his conclusions and provide factual content by identifying and specifying the applicable provision(s) and section(s) of the Bylaws that were allegedly violated. (*Id*. at 7). Moreover, DCM argues that notwithstanding the Trustee's contention that the corporate documents limit what DCM and its clients could do, the November 14, 2011 Shareholders and Directors Resolutions were unanimously approved by the owners and managers

---

[7] "The Court's discussion of the standard of review thus begs the question of what the appropriate test for determining non-statutory insider status is. I do not seek to answer that question, as the Court expressly declined to grant certiorari on it. I have some concerns with the Ninth Circuit's test, however, that would benefit from additional consideration by the lower courts." *Id*. at 970 (Sotomayor, J., concurring). That said, Justice Sotomayor did acknowledge that "because prongs one and two [of the Ninth Circuit's test] are conjunctive, a court's conclusion that the relevant transaction was conducted at arm's length necessarily defeats a finding of non-statutory insider status, regardless of how close a person's relationship with the debtor is or whether he is otherwise comparable to a statutorily enumerated insider." *Id*. (footnote omitted).

of OEI—100% of the 2011 Directors and Shareholders of Olmos Equipment, Inc. —and, upon execution of the consent, superseded any contrary provisions in the Bylaws. (*Id*. at 9). These resolutions placed control of OEI under Struhoff's supervision. DCM argues that the corporate resolutions were never reversed, and, based on this document, the corporation and all the shareholders waived all their rights and causes of action against Larry Struthoff as well as agreed to hold harmless and indemnify Larry Struthoff, including payment of his attorneys' fees and court costs. (*Id*. at 10).

In Plaintiff's Opposition to Defendant's Motion to Dismiss, Plaintiff argues that the Trustee has sufficiently set forth factual allegations that plausibly contend that DCM unduly influenced OEI to pay DCM for the representation of Struthoff and SWL. (ECF No. 13 at ¶ 1.02).  Further, the Litigation  Trustee maintains that he has sufficiently set forth factual allegations that plausibly demonstrate that DCM knew that OEI was only authorized to indemnify Struthoff (and not SWL) for legal fees incurred by Struthoff in his capacity as an officer or director of OEI "actually and necessarily incurred by [him] in any action, suit, or proceeding to which [Struthoff] is made a party by reason of holding that position." (*Id*.).  The Litigation Trustee argues that he has sufficiently plead and facially met his burden for plausibility under Fed. R. Civ. P. 12(b)(6). (*Id*. at ¶ 2.02). The Litigation Trustee asserts that the First Amended Complaint allows the Court to draw the reasonable inference that DCM received a preferential transfer because: "(1) the existence of the debtor-creditor relationship between OEI and DCM, (2) the existence of the antecedent debt alleged to be owed by the Debtor to DCM, (3) that the Debtor made each of the payments to DCM which the Trustee seeks to recover, (4) that the payments were made and negotiated within the one year preceding the Petition Date, (5) that the Debtor was, based upon the Debtor's own admissions and the calculations of the Trustee's outside accountants, insolvent during at the time of the

payments to DCM, (6) that sufficient plausible facts have been plead to indicate that DCM qualifies as a non-statutory insider of the Debtor, and (7) that the payment to DCM enabled DCM to receive more than it would have received under the conditions set forth in § 547(b)(5)." (*Id.* at ¶ 2.05).

The Court reviewed Defendant's Reply to Plaintiff's Opposition and finds that the arguments raised duplicate earlier arguments in Defendant's Motion to Dismiss. Further, because Defendant does not raise any additional grounds for dismissing Counts 2 and 3 of the First Amended Complaint (which were previously denied), the Court will not revisit its prior ruling finding that Counts 2 and 3 met the plausibility requirements of Fed. R. Civ. P. 12(b)(6).

The Court agrees with DCM that Plaintiff has not met the plausibility requirements of showing that DCM is a non-statutory insider of Debtor. Under the two-prong test of ***U.S. Medical, Inc***, and ***Holloway,*** the Plaintiff has not shown that DCM had a sufficiently close relationship with OEI or that DCM exercised control or influence over the Debtor such that the transaction at issue was not done at arm's length. The facts as deemed true only allege a contractual relationship between DCM and OEI and the course of dealing between the parties was that of an attorney-client. DCM represented OEI in complex civil lawsuit in state court that resulted in an adverse judgment. Plaintiff's argument that Debtor's By-Laws or other corporate documents precluded DCM from representing Debtor is unavailing—Struhoff had the requisite authority to engage DCM. Plaintiff has not cited with any specificity as to which corporate provisions were violated. Plaintiff's assertion that DCM had access to OEI's internal documents is insufficient to support a finding that DCM exercised control or influence over OEI. The fact that Debtor made payments to DCM for services performed is precisely what any other legal counsel would have requested in the allegations raised here. The payments, based on Plaintiff's allegations, comport with what was

21

required under DCM's engagement letter. In sum, there are no facts to indicate that the transaction between the Parties' was anything other than arm's length.

## CONCLUSION

For the aforementioned reasons, the Court concludes that Defendants Motion to Dismiss Plaintiff's First Amended Complaint should be granted in part and denied in part.

IT IS THEREFORE ORDERED Defendant's Motion to Dismiss (ECF No. 12) is GRANTED as to Count 1 and DENIED as to Count's 2 and 3.

###